May it please the court, my name is Stephanie Adraktis and I represent the appellant Terebea Williams. Williams was convicted of first-degree murder where the primary evidence against her consisted of her own recorded statements to police. Those statements were elicited in violation of her right to remain silent under the Miranda rule because when asked if she wished to waive her rights and speak to the interrogators she said no. Under Miranda an interrogation must immediately cease if the suspect indicates in any manner and at any time prior to or during questioning that he wishes to remain silent. This court should not apply the AEDPA deferential standard of review to the Miranda claim in this case. Review should be de novo for two reasons. First the California Court of Appeal applied the wrong rule, the wrong doctrine when it analyzed the federal constitutional rule in this case. It applied the California rule, the rescue doctrine, rather than the Quarles emergency exception to Miranda. Second the application of either the rescue doctrine or Quarles to excuse the Miranda violation in this case was unreasonable under 28 U.S.C. 2254 D1 and D2. And you say that gives us authority to do something de novo? I do, Your Honor. Under Franz v. Hazy, which is cited in the brief, that case goes into and Is that a decision of the United States Supreme Court? It's a decision of this Court, Your Honor. Well, we're guided by the United States Supreme Court in this area. Understood, Your Honor. What U.S. Supreme Court is your authority? Your Honor, I can't cite a United States Supreme Court case on that point. That's what the debit tells us to do. Understood, Your Honor. However, Franz v. Hazy is correctly interpreting, I would submit the AEDPA. And in that case, this Court stated that in a state court opinion where the Court was analyzing a Fureta claim, that it should not have analyzed whether or not there was prejudice because that's a structural error. And so the Court, this Court said, under such circumstances, the Court must analyze the claim de novo. And so in this case, similarly, the California Court applied a doctrine that is simply not in accordance with the Quarrels Emergency Exception. Those two doctrines are so different that the Court, the California Court applied the wrong rule when Ms. Williams invoked her Miranda rights and made the claim in the Court of Appeal. The California Rescue Doctrine has three elements that are not in common, and they are not in common with the Quarrels Rule. In particular, the California Rescue Doctrine focuses on whether the police interrogators had a motive of rescue or to save someone during the interrogation. And there are cases where the California Courts have applied that rule to allow questioning outside of Miranda that goes on for an extensive period of time, and that includes interrogation that's designed to be investigatory. The Quarrels Opinion of the United States Supreme Court, which is the opinion that we rely on in this case, states very specifically that the emergency exception to Miranda only encompasses public safety emergencies, like the one in that case where they were in a public place, there was a gun that was hidden, there was a potential harm to the public or to the police if the gun was not found. Was there a potential harm to this man who had been in the trunk? Certainly, Your Honor, and that's the case. The magistrate's analysis in this case does address that subject, and the magistrate, the district court, stated, well, under Quarrels, the emergency exception, the Federal rule, it potentially doesn't apply here because this isn't the public. There's some cases that say it has to be a generalized threat, not just to one particular person. Why should that be? I'm sorry? Why should it have to be generalized? One human life is important. I agree, Your Honor, and the magistrate resolved the issue in the same way the court is now suggesting, stating, well, although there's not a case that specifically says that Quarrels applies to rescue a particular victim, the court, the district court, found that it would apply in this circumstance if the concern was to rescue Mr. Quarrels. Well, you know, you're the party that needs cases, not the government, so. Understood, Your Honor, and I would submit that even if one were to concede that Quarrels applies to rescue a particular person and not to protect the public at large or police officers, that it was an improper application of Quarrels here because Quarrels requires that the questioning be done in an urgent, immediate need to accomplish, let's say, the rescue or protect the public right then. These police officers waited three, more than three hours before asking Ms. Williams anything about where Mr. Rusca was located. I could have moved faster, but I mean, is that disqualifying? I don't think so. Your Honor, it does because otherwise the Quarrels exception would swallow the case. Well, why would it swallow? The occasions in which somebody else's life is at stake are not going to be very many. Your Honor, I understood. It would swallow the rule in cases where there was substantial harm to someone here, though the elapsing of three hours ---- Somebody's life is at stake. Understood, Your Honor. And if the police officer on the scene who had discovered the blood in the trunk had said to Ms. Williams right then and there, Ms. Williams, where is this person? Outside Miranda, I would say, Your Honor, that's probably under Quarrels and Emergency. He chose his way of trying to get at the facts. I mean, you're saying that should be a ---- we should have a blueprint as to how they question? No. Well, Your Honor, waiting that long, three hours, without asking any questions at all, as well as arranging to videotape the interview before asking any questions, that's not a ---- an effort to save someone who is potentially dying. What that very much represents is that the police are trying to do an investigatory interview that's video recorded so they can present it to a jury and convict Ms. Williams. That's exactly what the Quarrels' opinion says that the police may not do. They may not conduct investigatory questioning under the guise of short, brief questioning in order to address an emergency. The elapsing of time here, as well as the arranging for the videotaping, defeats any Quarrels' exemption in this case. The magistrate specifically found that in his findings and recommendations. He found that the Quarrels' rule could not apply, given how the police handled this case. So given that, this court must then go to, was there a Miranda violation? And certainly there was. I mean, in this case, when asked whether she would waive her rights, Ms. Williams said no. And I, throughout my brief and now, point to this court's decision in Anderson v. Terhune, which relies on Miranda, and Michigan v. Mosley, as well as a number of other cases. However, it is very clear, and the analysis in Anderson is complete on this point, that when a suspect invokes his or her Miranda rights in clear and plain terms, as Ms. Williams did here, that there is no need for clarification. Well, let's talk about that a little bit, whether it was clear and plain terms, especially in light of the context of the conversation that took place, the interrogation. There was some repeating of the first part of the rights that needed to be done, because apparently Ms. Williams didn't hear or didn't understand what the officer had said. I believe he said, you have the right to remain silent. Anything you say can and will be used against you in a court of law. Understanding these rights, do you wish to talk to me now? And Ms. Williams, because I had a chance to view the video, leaned over and says, do I understand them? And then the detective says it again, the last part again, I think, understanding these rights, do you wish to talk to me now? Then she says, no, no. And then he says, don't want to talk to me? And she says, do I want to talk to you? And the detective says, yes. And then she says, oh, I don't care. OK. So how is that an unambiguous statement? Your Honor, because when the question that he asked is, do you want to talk to me, and she said, no, that should have been the end of the interrogation because no is no. And the case law is very clear that once that no is uttered, that the officer is not to ask questions subsequent to that to do any kind of clarification. In addition, I would point to experts. What's the standard, though? Is it an objective officer, whatever, an objective officer would have reasonably understood that to be no? The standard that's discussed in Anderson is that there be no words of clarification like maybe or maybe I should. How about um, no? The um that I did not find any case law suggesting is sort of making a noise like that. But the court in Anderson talked about, well, what does ambiguous mean? And they do talk about words of equivocation, which there are none here. In addition, it is highly relevant that during the suppression hearing when the she said no, she meant she didn't want to talk to you. This is at excerpts of record 409. He said, yes, I understood that no meant. He thought that he could go back and talk to her again because he was following the quote, unquote, bifurcated Miranda process that has been since discredited by the U.S. Supreme Court. But that's what was going on here. The detective understood that she was saying no. He thought that he could just go around that, re-advise her later, and get a ballot stamp. Do you have a part in the record, though, where the officer says, well, I didn't understand what she was saying? Subsequent to that. But in the same hearing, he's giving those two inconsistent answers in the middle. But we credit one and not the other? Your Honor, I would say when the officer said in response to the direct question when she said no, she understood she meant that you didn't want to talk to her, he said, yes. I think the court should credit that because, you know, he is giving a direct answer. Does he have the other part, though, where the officer testified about that? That doesn't support you, I know, but do you have that? Yes, later on, because he obviously was well aware that he needed to justify continuing to question her, and at that point, he also said, for example, that he didn't know that if somebody invoked their rights that he couldn't continue to question them. And, you know, as I suggested in my brief, that's not a credible statement by a homicide detective. He certainly should have been and would have been trained that when someone invokes their Miranda rights, they're supposed to stop. The, I think the crucial issue here, though, is that there are no words of equivocation. There's nothing, there were not, there were no words to suggest that she was in any way equivocating about assertion of rights. And also, the opinions talk about, well, what happened during the rest of the interrogation? We know that she again invoked her rights later in the interrogation, excerpts of Record 104, when she says, I'm not going to keep answering all these questions. And then she talks repeatedly about the fact that she's not going to talk about anything except a potential gun charge. Under Arnold's versus Runnell's, this court's opinion, again, talking about a suspect's right to selectively invoke their Miranda rights. She clearly did. And that adds additional weight to the interpretation of her initial no that Detective Marks received, which was she was saying, I don't want to talk to you. She said that again later. And she tried again and again to limit the scope of the interrogation. She did not want to talk to the officers, but she did because they kept questioning her. And the Miranda opinion discusses at length, as well as, you know, subsequent opinions to Miranda, the notion that when the officers keep questioning a person who's invoked their rights, they're sending that person the unmistakable message that they can't invoke their rights, that they're going to continue to be questioned no matter what they do. So, Your Honors, I would like to reserve the remainder of my time unless the Court has a question. Sotomayor, I have just one quick question. I just want to make sure, you've not argued that Williams, Ms. Williams did not understand her rights under Miranda as a result of her hearing impairment or any other factor, is that correct? Your Honor, that is not an exhausted claim. However, should the Court find that the no was referring to whether she understood her rights, that would be a different matter. I think that's something that came up during the suppression hearing. It's included in the excerpts of records of the suppression hearing. But there was some indication that the no had to go to something important constitutionally. It either meant that she was invoking her right to remain silent or it meant that she was saying, no, I don't understand what you're saying. So, Your Honor, I hope that answers the question. Good morning, Your Honors. May it please the Court, David Andrew Eldridge, Deputy Attorney General for Respondent. Actually, to the extent you are looking at whether or not what the officer understood or rather whether a state court had to have a particular understanding of what the officer understood, on the very same page 409 of the excerpt of record, in that very same exchange where it says, what did you understand to mean, just a few lines later it says, were you attempting to clarify? And the officer says, yes. So it isn't much later in another hearing that he clarifies, here's what I was trying to do. Rather, he says, right then in the very same exchange, what I was trying to do was clarify. He's asked a direct question there just a couple lines later. So isn't it some after the fact? Well, but he doesn't get to clarify if it's clear. Your Honor, actually, well, there is no Supreme Court case, Your Honor, that says that. And the Supreme Court case says you can't ask any, you can't engage any further interrogation. Well, I thought you could, and correct me if I'm wrong, I thought you could ask clarifying questions if it was ambiguous. The only rule from the United States Supreme Court, Your Honor, is that interrogation must cease. An interrogation is a question that is likely to elicit an incriminating response. A question, what did you just mean by what you said, is not interrogation at all. It is actually clarification simply of, do you wish to or not? There is no Supreme Court case saying that such a question could ever amount to interrogation. And there's no Supreme Court case that says something short of interrogation must cease, even after an ambiguous, unambiguous statement. But as, of course, the district court found, this was ambiguous. It cannot be said that no reasonable court could fail to find that this statement had only one inference that could be drawn as to her meaning. Rather, there are at least two. One is that she is saying, I don't understand some of the things you're saying so far. Another is, I do understand, and I don't want to talk. So given that there are at least two interpretations, one which allows you to go on, and one which even under the most stringent, sorry, under the most stringent version would say stop, that's ambiguity, or as so a state court could find. And that's exactly what the trial court found. And of course, so did the district court. The challenge to California's rescue doctrine, actually California is, the focus, California does indeed require under the rescue doctrine that the officer have an intent to rescue. But that just makes it more protective than quarrels. It doesn't make it somehow that something would get past the rescue doctrine in California that would be stopped by quarrels. Rather, it's California under its rescue doctrine includes an additional element. And there's no Supreme Court authority that is violated because the state uses a more protective standard. Also the clarification that under quarrels it has to be, the question has to be immediate. Again, there is no language in quarrels to that effect. There is, all the refinements that are argued, found by the district court below and in the brief on appeal, they are not from California, they are not from the Supreme Court's opinions. So they do not apply. Quarrels is the only case out there. And all the quarrels said was the narrowing, the only narrowing set forth in quarrels was this. And one of them, by the way, is very substantial. At the time of the interrogation, there must be an ongoing emergency. That's, to say that that's going to swallow up Miranda makes no sense because in most cases, the ongoing emergency, there will be no ongoing emergency at the time of interrogation. There's nothing to suggest that normally crimes are discovered so quickly that any emergency caused by them will ever be addressed by the interrogation. In fact, it's often months, weeks, days later. So to say that that will swallow, it won't. Rather, it is substantially narrowed by the very fact that there must be objective evidence of an ongoing emergency. The other narrowing thing, or at least a state court recently could find, would be the questions can't be the sort solely designed to get evidence that might incriminate. In quarrels itself, it points out, of course, the officers almost inevitably will still want to get incriminating information, but so what? And when the dissent in quarrels pointed out, well, then why don't you just stick to non-incriminating questions? They said, no, absent the Miranda, absent a violation of our Miranda setting, which we're saying it doesn't just because it's incriminating. There is no reason for them to stick to purely non-incriminating statements. I don't have any other affirmative points to make, Your Honor, but I'm happy to answer any questions. I just want to make sure I understand your view of Anderson v. Terhune. My view of Anderson v. Terhune, Your Honor, it is a pre-Richter case that no state court is bound by. It is not from the United States Supreme Court, and it did not even have the benefit of Richter's correction of this circuit's prevailing manner of interpreting AEDPA. And Richter pointed out, Your Honor, that what this circuit was doing was not applying the right standard under AEDPA under D1. That standard is to consider any arguments or theories that could have supported the state court opinion and ask if is it even possible for a fair-minded jurist to adhere to that. That certainly isn't what Anderson v. Terhune did, Your Honor. So to the extent Anderson v. Terhune felt that it could fashion rules, that is overruled by Richter because Richter says the analysis is very, very clear under AEDPA. You must consider any and all theories that either supported or could have supported the state court opinion. Then you must ask if any fair-minded jurist could possibly have agreed that that was consistent with the Supreme Court's opinion. Anderson didn't do that at all, Your Honor. So what you must follow is Richter, which effectively overrules the mode of analysis in Anderson v. Terhune, Your Honor. During the three-hour examination, three hours later, it was 10.30 when they began to do the heavy inquiry, Williams, I think... There were some hours in between. They were still... Were they not still looking for the victim? Your Honor, this is one of the points... At that point, they don't even know there's a victim. They are trying... Any argument that, why didn't they immediately start asking where Kevin Ruska was? They didn't even know if Kevin Ruska was a victim. Well, he was at a motel in Vowell. I'm sorry? At some stage, they suspected that it was a motel in Vowell, and the victim might be located in the motel. And that was a fact. He was located in a motel, right? Yes, he was. And he passed away from peritonitis. He didn't die immediately. Yes. Okay. If they were successful in finding him, soon enough, as any evidence indicates, he may have survived the attack. Peritonitis, as I understand it, I can be very much wrong. Your Honor... It's a disease due to a gunshot wound. Your Honor, I think it would be speculative to say that we would know whether or not the victim would have survived. Certainly, had they found the victim sooner, they might have gotten him medical treatment, but we honestly don't know whether he would have survived. But part of the problem is, they didn't even know... They didn't know that Kevin Ruska was the victim until they got her to even explain, who were you with? Trying to even connect this gun that she has to the bullet hole in the car. They know there's blood in the car. They don't actually know yet that there's a victim. They don't know, certainly, that it's Kevin Ruska. They don't even know it's a male at that point. That's part of what they had to keep going bit by bit to try to get from her. The Court of Appeal in California set forth clearly what they actually knew. There's blood in the car and there appears to be a bullet hole in the car. And it's fresh, so there might be a victim. That's all they knew. They don't know who it is. They don't actually know someone's in a hotel room anywhere. They don't know how long ago it happened, if it was an attack. All they know is, we need to figure out, is there a victim? And bit by bit, they got there. They tried to figure out, where have you been? The statement by the district court below, for example, saying, no questions regarding location of a potential victim for so many pages is incorrect. When they're asking her where she's been, they are certainly trying to track down where she might have left a victim. This inquiry could have had a dual purpose, to find where the victim was in an emergency situation. But also in the questioning directed to that goal, you may still be listing statements by her that would incriminate her. Quarles says that's virtually inevitable. And that there's simply no problem with it. Rather, so long as the sole purpose isn't incrimination, the statements are admissible. They pointed out that very point, that it is almost inevitable that there will be that additional motive, and it's just not a problem. Thanks. Thank you, Your Honor. I'd like to quickly address counsel's comments regarding the Richter opinion. The Richter opinion involved a silent denial of an estate court, which did not include an analysis. And the question before the Supreme Court was how to analyze that under the AEDPA. That's not what we have here. This court has addressed on this very issue in Williams versus Cavazzo. Cert was accepted on that. However, the way that the Ninth Circuit has currently interpreted the posture, where we are now in this case, is that when there's a silent denial, as we have, of a petition for review on direct appeal, then the court simply looks through to the court of appeal opinion. So we don't have that same wide-ranging, let's come up with any kind of theory, because we have a silent denial in order to affirm. So that just doesn't apply here, that scenario in Richter. And then secondly, Richter involved a EE deferential standard review, because that was an ineffective assistance of counsel claim. And the Supreme Court made that very clear in that opinion. So moving on to what Quarles states, I would like to point out that the Supreme Court was very clear in that opinion that questions may not be designed to elicit incriminating testimonial evidence. All of the circumstances in this case show that that's exactly what the interrogation was all about from start to finish, beginning with the substantial roadside delay. They're completely ignoring the plight of the victim and is designed to be presented at trial and was presented at trial. All of the interrogation questions the detective admitted at the suppression hearing, I was trying to build up her credibility. He spent time doing that. And the reason, of course, is because he wants a jury ultimately to believe whatever confession that she ultimately gave. That has nothing whatsoever to do with rescue. Of course, the officers had to have known as soon as they opened the trunk and saw a bullet hole and blood that there was a victim. They had to have known that. Whether they knew what his name was or anything of that nature, that doesn't matter. You don't need to know a person's name to be able to say to the person who's standing in front of you, where is this guy or where is this person? And they could have said that at roadside. That would have been a proper application of Quarles. In fact, there was a proper application of Quarles in this case because the officer, without Mirandizing, Williams said, where's the gun? And she told him where it was and he got it. So showing, I'm trying to illustrate here that Quarles can be properly applied in that manner, but it does not allow the kind of interrogation that took place. I just have one last question. That's about prejudice or harmless error. Can you discuss that, please? Yes, Your Honor. The analysis in Arnold v. Runnels and in Anderson v. Terhune is very instructive on that point and demonstrates without question, Runnels talks about the fact that when the prosecutor dwells on the statements in opening statement and closing argument, the defendant's statements, that shows that the error was not harmless. And we need to look to not just was there enough evidence to convict? That's not the issue under Brecht, and Brecht makes that very clear. We looked to whether there was an impact on the jury. Here there clearly was. There was extensive, overwhelming reference to these statements throughout the opening statement and closing argument of counsel. There's no way that Ms. Williams could have been convicted of kidnapping, for example, of a first-degree murder without knowing what her statements were about what happened. There was simply no evidence except her statements to tell the jury what scenario ultimately led to Mr. Ruska's death. So it is very clear. And I know when you say there's no evidence except for statements, I mean, there was a lot of evidence at the motel room. Wasn't there connecting her to this crime? There was evidence connecting her? In the car. I mean, it was his car. They found her in his car, driving his car, correct? Correct, Your Honor. And in the hotel room, wasn't there a palm print, her bloody palm print somewhere in the hotel room? Clearly, the prosecution could connect Ms. Williams to this offense, could say she obviously did it, she was with him, there was her palm print, she had him in the hotel room, she had the duct tape. Could they say she got him out of the car, shot him, put him in the trunk, drove him, the kidnapping, you know, did she, was it an accident or not, they would not have been able to, the shooting. They would not have been able to give any information to the jury or describe any scenario about how he came to be shot. All right. And thank you very much. Thank you, Your Honor. Thank you for your arguments here today. We will, the case is submitted and we will be in recess for the rest of the day. Thank you very much.
judges: Timlin, Noonan, Murguia